UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------X
KATHY H. PLOURDE,

                              Plaintiff,                    02-cv-5532
                                                           (SJF) (ARL)
            -against-
                                                    **OPINION & ORDER**

JOHN W. SNOW, Secretary of Treasury,
Internal Revenue Service,

                              Defendants.
-----------------------------------------------------X
FEUERSTEIN, J.

I.      Introduction

        Plaintiff Kathy Plourde ("Plaintiff" or "Plourde") commenced this action against

defendants John W. Snow, Secretary of Treasury[1] and the Internal Revenue Service (collectively,

"Defendant"), alleging violations of the Rehabilitation Act of 1973, 29 U.S.C. 701 *et seq.* (the

"Rehabilitation Act"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title

VII") and intentional infliction of emotional distress. Defendant moves for summary judgment

on all counts pursuant to Fed. R. Civ. P. 56. For the reasons set forth below, Defendant's motion

for summary judgment is granted.

II.     Background

        A.      Employment History

        Plaintiff has been employed by the Department of Treasury, Internal Revenue Service

("IRS") since 1973. (Joint Pretrial Order ¶ 1; Def/Pl. 56.1 Stmt. ¶¶ 1-2).[2] In either 1989 or

---

[1]The named defendant in this action was originally Paul H. O'Neill, sued in his official capacity as Secretary of the
Treasury of the United States of America. Pursuant to Fed. R. Civ. P. 25(d), Mr. O'Neill's successor, John Snow, is
automatically substituted as the Defendant in this action. See Fed. R. Civ. P. 25(d). Furthermore, although the
President nominated Henry M. Paulson on May 30, 2006 to replace Mr. Snow, Mr. Paulson has yet to be confirmed
by the Senate. Cf. McLaughlin v. Biasucci, 688 F. Supp. 965, 966 n. 1 (S.D.N.Y. 1988).

[2]Those paragraphs in the parties' Rule 56.1 Statements agreeing that a fact is undisputed are jointly referred to as
'Def/Pl. 56.1 Stmt. ¶ __.'

1991,[3] Plaintiff became a Supervisory Tax Examiner Assistant, GS-11 level, ("Section Chief"), in the Error Correction and Reject Program ("ERRP") of the Document Perfection Branch at the Brookhaven Service Center. (Joint Pretrial Order ¶ 3; Def. 56.1 Stmt. ¶ 3; Pl. 56.1 Stmt. ¶ 3). The position of Section Chief was a "full-time, second-level supervisory position." (Def/Pl. 56.1 Stmt. ¶ 39). Although the size of the staff fluctuated depending upon the season, (Def/Pl. 56.1 Stmt. ¶ 24), each Section Chief generally supervised five (5) managers who, in turn, supervised approximately one hundred and fifty (150) employees. (Def/Pl. 56.1 Stmt. ¶¶ 25, 41). The Section Chief was responsible for "planning, directing, and controlling the activities of positions in subordinate organizations." (Def/Pl. 56.1 Stmt. ¶ 42).

Plaintiff's department, ERRP, was responsible for resolving errors in both individual and business tax returns. (Def/Pl. 56.1 Stmt. ¶ 27). In the event an error could not be resolved internally, ERRP was responsible "for corresponding with the taxpayer, . . . perfect[ing] the tax return, and . . . inputting the perfected tax return into the IRS processing system." (Def/Pl. 56.1 Stmt. ¶ 28). At times, the Brookhaven Service Center handled fifty-thousand (50,000) to eighty-thousand (80,000) errors per day. (Def/Pl. 56.1 Stmt. ¶ 51). These errors needed to be reconciled within two (2) days in order to comply with statutory requirements for the timely disbursement of tax refunds. (Id. ¶ 50). This required "[t]he ERRP Section Chief . . . to closely monitor and control the workflow . . . [,] constantly monitor and reallocate resources to meet the changing needs of the program." (Id. ¶¶ 53-54). In the event "a [computer] system issue arose, the ERRP Section Chief was required to undertake immediate efforts to resolve the system issue." (Id. ¶ 55).

---

[3]The Joint Pretrial Order submitted by the parties stipulates that Plaintiff became a Section Chief in 1991. (Joint Pretrial Order ¶ 3). Plaintiff disputes this date in her Rule 56.1 Statement, however, and claims that she became a Section Chief in 1989. (Pl. 56.1 Stmt. ¶ 3). The specific date on which Plaintiff became Section Chief is irrelevant to the instant motion.

B.     The April 11, 1997 Injury

On April 11, 1997, Plaintiff injured her back while at work. (Joint Pretrial Order ¶ 4; Am. Cmplt. ¶ 8). She spent approximately the next eighteen (18) months on paid disability leave. (Def/Pl. 56.1 Stmt. ¶¶ 63, 65). Plaintiff's supervisors called her numerous times to inquire as to her anticipated return date, which she claimed she could not provide. (Def/Pl. 56.1 Stmt. ¶ 66).[4] Mark Bernstein, the Branch Chief for Document Perfection, met with Edward Safrey, the Submission Processing Assistant Division Chief, (id. ¶¶ 35-36), "to discuss provisions the Branch should make to put a temporary replacement in plaintiff's Section Chief position." (Id. ¶ 68). Bernstein and Safrey agreed that "[t]he Document Perfection Branch [would] rotate[] several managers through the Section Chief position and then double-encumber[] the Section Chief position (i.e. paying two employees at full-time salaries to perform the duties of the position) by temporarily assigning Carol Losee to the full-time Section Chief position." (Id. ¶ 69). During her assignment as Section Chief, Losee was paid at a GS-11 level. (Id. ¶ 72).

Plaintiff returned to work on November 16, 1998 on a part-time basis. (Id. ¶ 73). Although the Section Chief position was "still a full-time position and the duties and responsibilities were the same as before plaintiff went out on disability leave," (id. ¶ 74), Plaintiff was permitted to work four (4) hours per day, five (5) days per week. (Id. ¶ 73). However, although Plaintiff retained the grade and title of Section Chief, it is undisputed that she "did not assume the duties and responsibilities of the Section Chief position . . . . [Rather,] Losee continued to perform the duties of the full-time Section Chief position and plaintiff was given

---

[4]Plaintiff's Rule 56.1 Statement purports to deny the allegation that her supervisors called her. However, her specific objection actually concedes that they did call her, but claims that "there was no need to contact plaintiff" because Defendant had her "most recent reports from her treating physician . . . ." (Pl. 56.1 Stmt. ¶ 66). Therefore, while the need for these calls is possibly in dispute, their existence is not.

administrative assignments that could be accomplished during her part-time schedule." (Id. ¶¶ 75-76). Under this arrangement, the first-level managers reported to Losee, and Plaintiff "did not oversee any work related to the daily activities of employees in the Document Perfection Branch." (Id. ¶¶ 77-78). Plaintiff claims that she neither requested nor required this arrangement, but was "not permitted to assume the duties and responsibilities of her Section Chief position." (Pl. 56.1 Stmt. ¶ 75).

Shortly after Plaintiff returned to work, Bonnie Fuentes became Branch Chief.[5] (Def/Pl. 56.1 Stmt. ¶¶ 37-38). According to Defendant, Fuentes conferred with Division Chief Michael Spiotta, among others, and "determined that the essential duties of the Section Chief could not be performed in a four[-]hour day." (Def. 56.1 Stmt. ¶ 79). Fuentes determined that "the ability to make decisions, to make adjustments when those decisions turned out not to sufficiently address the requirements of the program, and to be held accountable for such decisions required that the Section Chief position be held by one individual working a full-time schedule, providing important continuity." (Def/Pl. 56.1 Stmt. ¶ 81). Fuentes therefore decided that "Losee would continue in the Section Chief position until the agency knew more about plaintiff's medical condition; specifically how many hours she could work." (Id. ¶ 83). In reaching this conclusion, it is undisputed that Fuentes considered

> (1) that the Section Chief position was a vital position to the Document Perfection Branch with numerous duties; (2) that most incumbents could not perform the essential functions of the job in an eight-hour workday; (3) that plaintiff had been out for more than a year and during that time internal procedures had changed; (4) that the Section Chief supervised two shifts of employees; (5) that there was a tremendous amount of work to be completed each day; ([6]) that the ERRP section was dependent on the computer system; and ([7]) that the Section Chief had both experienced and inexperienced managers reporting to her.

---

[5] Lucy Hoffman served as Acting Branch Chief during the brief period between Bernstein and Fuentes. (Def/Pl. 56.1 Stmt. ¶ 37).

(Pl/Def. 56.1 Stmt. ¶ 80).

Although Plaintiff argues that her extensive experience and the experience of her "first line" supervisors made her "different than most other Section Chiefs," (id.), she concedes that "[p]rior to her injury in April 1997, [she] did not have a lot of down time while she was working the full-time position as Section Chief." (Def/Pl. 56.1 Stmt. ¶ 62).

B.    Plaintiff's Request for Accommodation and Her Transfer

In September 1999, at the request of the Office of Worker's Compensation ("OWCP") , Plaintiff was examined by Dr. Robert Moriarty, a Board Certified Orthopedic Surgeon. (Id. ¶ 85). Dr. Moriarty indicated in a September 9, 1999 report that Plaintiff was capable of working six (6) hours per day, and that, in three (3) months time, she should be capable of returning to a full eight (8) hour work day. (Id. ¶ 86).

On November 2, 1999, Plaintiff "fell over the steps that were directly next to the area outside the training room by the cafeteria." (Am. Cmplt. ¶ 53; Def/Pl. 56.1 Stmt. ¶ 87). She completed an injury report on November 3, 1999. (Pl. 56.1 Stmt. ¶¶ 274-75). On November 12, 1999, Defendant "offered to keep plaintiff in the Section Chief position, while increasing her work schedule to six hours per day for an additional three month period, after which plaintiff would be returned to full-time status." (Joint Pretrial Order ¶ 18). According to Plaintiff, "[w]hen Fuentes handed plaintiff the November 12, 1999, job offer, she asked plaintiff what she wanted her to do with the November 3, 1999 [injury report f]orm." (Pl. 56.1 Stmt. ¶ 289). Plaintiff claims that she was "surprised that it was not sent in yet because it was supposed to have been sent in two (2) days after it [wa]s filled out." (Id. ¶ 290). Plaintiff claims that the failure to timely submit her injury report was a form of intentional discrimination. (Id. ¶ 292).

On November 24, 1999, Plaintiff's treating physician, Dr. John Acampa, issued a report stating that Plaintiff could not work in excess of four hours per day. (Id. ¶ 96). Although Defendant claims this assessment was a result of the November 2, 1999 injury, Plaintiff claims Dr. Acampa had "never approved a work schedule of more than four hours per day . . . ." (Pl. 56.1 Stmt. ¶ 96). On November 26, 1999, Plaintiff responded in writing to Defendant's November 12, 1999 offer, and "insist[ed] that she could not work more than four hours a day and requesting that she be kept on her four hour per day schedule." (Joint Pretrial Order ¶ 19).

On December 9, 1999, OWCP "accepted plaintiff's workers' compensation claim stemming from the November 2, 1999 injury as a compensable injury." (Def/Pl. 56.1 Stmt. ¶ 89). On January 6, 2000, Defendant denied Plaintiff's request to remain in the Section Chief position on a part-time basis. (Id. ¶¶ 101-02). The denial letter explained

> [t]he medical statement submitted by Dr. Acampa regarding your present condition, however, is not sufficient to enable us to continue you in your present work status. Dr. Acampa's statement did not address the limitations your condition requires in relation to the duties of your Section Chief position. Nor did his medical statement provide a prognosis for your present condition; rather, it merely advised that he would re-evaluate your work duty status on a forty-five day basis. You have been unable to perform the duties of your Section Chief position since your injury on April 11, 1997. While the Agency is willing to continue to make a reasonable effort to keep you employed in a manner consistent with your capabilities and with the business needs and mission of the Agency, we cannot continue to double-encumber your Section Chief position indefinitely. We must know that you will return to full-time status and resume the duties of your Section Chief position within a reasonable time. Otherwise, we must consider permanently reassigning you to a position that does not require a full-time employee. Unfortunately, the position about which you inquired (Management and Program Analyst, V.A. 06-81-0078C) is not one that can be performed by a part-time employee.

(Id. ¶ 102) (quoting Mirabile Decl., Ex. T). The letter requested that Plaintiff provide, within fourteen (14) days, "additional information regarding her medical condition, including a statement from plaintiff's physician stating an approximate date on which she would be able to

return full-time or a statement that she would have to work part-time indefinitely." (Def/Pl. 56.1 Stmt. ¶ 103). Defendant also stated its intention "to permanently reassign plaintiff to another position," (id. ¶ 104), if this information was not provided within fourteen (14) days. (Id.).

Plaintiff responded on January 15, 2000, characterizing Defendant's request as "improper" and stating that she remained unable to work a full day. (Pl. 56.1 Stmt. ¶ 105). Plaintiff also stated that all medical documentation relevant to her limited work schedule had been provided to Defendant. (Id.). She did not provide a statement from a physician as requested.

Defendant claims that it "searched for vacant positions at plaintiff's level but was unable to locate any that plaintiff could perform within her restricted four-hour work schedule." (Def. 56.1 Stmt. ¶ 107). However, according to Plaintiff, "Defendant did not search for vacant positions at Plaintiff's level; rather their very limited search was for any position that could be performed in a four-hour workday. Carmen Belford's March 17, 2000 e-mail does not state that the employee for whom the search was being conducted was plaintiff. Moreover, the e[-]mail does not indicate that the employee was an experienced Section Chief, GS-11. Furthermore, Ms. Belford's e-mail provided its recipients with less than one week to respond." (Pl. 56.1 Stmt. ¶ 107). In March 2000, Plaintiff's request for disability leave based on her November 2, 1999 injury was approved. (Def/Pl. 56.1 Stmt. ¶ 90).

On April 12, 2000, Fuentes "informed plaintiff that the IRS could no longer continue to retain her in the Section Chief position because it required the IRS to pay the salaries of two full-time employees for the Section Chief position. Fuentes listed four lower[-]graded positions to which plaintiff could be reassigned which could accommodate plaintiff's need for a part-time schedule." (Joint Pretrial Order ¶¶ 20-21) (paragraph break omitted). Plaintiff rejected all four

of these positions. (Id. ¶ 24). On May 23, 2000, Fuentes sent a letter to Plaintiff offering her an opportunity to reconsider her rejection of the positions, stating that management "would wait until after June 16, 2000 to propose removal" in order to allow Plaintiff additional time to reconsider. (Id. ¶ 25).

On June 15, 2000, Plaintiff sent a letter to Defendant stating her desire to return full-time, but requesting an extension of the four-hour workday for an additional one hundred and twenty (120) days. (Id. ¶ 26). Plaintiff advised that she did not wish to resign, retire on disability or accept a position at a lower grade, and that, despite her request, she was "uncertain as to whether 120 days would be sufficient." (Id.) On June 27, 2000, Dr. Acampa issued a report indicating that Plaintiff "was limited to four hours of work per day and that he was unable to make a prognosis as to when she could resume full-time work." (Id. ¶ 27).

On July 13, 2000, the IRS proposed to remove Plaintiff from employment because her part-time schedule required it to double-encumber her position. (Id. ¶ 28). Upon an internal appeal, Director James Gaither modified the decision on January 16, 2001, directing that Plaintiff be downgraded to a GS-9 position rather than terminated. (Id. ¶¶ 29-30). This position was created for Plaintiff, because "GS-9 analysts worked in groups, thereby providing back-up for plaintiff who could only work four hours per day." (Def/Pl. 56.1 Stmt. ¶ 112). Plaintiff was reassigned to the GS-9 position on January 29, 2001. (Joint Pretrial Order ¶ 31).[6]

---

[6]Prior to Plaintiff's reassignment, she applied competitively for several full-time GS-11 and higher positions, for which she was not selected. (Def/Pl. 56.1 Stmt. ¶ 136; see also Am. Cmplt. ¶¶ 41-43). She claims that she was not selected because of her disability or in retaliation for her complaints. (Pl. 56.1 Stmt. ¶ 145; Am. Cmplt. ¶¶ 42-43, 48-49). In support of this allegation, she claims that, inter alia, she was asked about her disability at an interview, and that her uncorrected evaluation, discussed infra, referred to her disability. (Am. Cmplt. ¶¶ 42-43, 48). Defendant claims that Plaintiff failed to officially apply for a number of those positions, that one position was never funded or filled and that Plaintiff was not selected for the remaining positions because she was not as qualified as the individuals selected. (Def. 56.1 Stmt. ¶¶ 152-58). Plaintiff concedes that after she was rejected for one GS-11/12 position, she was offered but declined "the opportunity to work part-time in [the selecting official's] area in order to gain more recent experience." (Def/Pl. 56.1 Stmt. ¶ 147-48).

C.    Hostile Work Environment and Disability-Related Claims

Plaintiff claims that she was subjected to discriminatory treatment and a hostile work environment upon returning to work in November 1998.

It is undisputed that Plaintiff was "not given her old office and desk to sit in . . . ." (Def/Pl. 56.1 Stmt. ¶ 193). Losee occupied Plaintiff's former office space, and Plaintiff was seated "out on the floor in a factory layout style." (Id. ¶ 194). However, it is also undisputed that Plaintiff never requested her former office, and did not "raise any issue regarding her seating location . . ." and never filed an EEO complaint on this basis, (id. ¶¶ 197-98), although she appears to claim now that the arrangement was discriminatory.

Plaintiff also claims that she was "discriminated against in work place assignments, including being given unrealistic time frames for the completion of projects and increased supervision[,] . . . that she was deliberately kept out of touch with the daily activities and tasks of the ERRP section and that she was excluded from management meetings because of her alleged disability." (Id. ¶¶ 199-200). She also alleges that she was subjected to increased supervision, and otherwise treated differently than "similarly situated employees." (Am. Cmplt. ¶ 38). Plaintiff does not specify which employees she considered similarly situated.

Plaintiff also claims that Safrey, her supervisor, advised her during a mock interview that "she might be asked if she would be able to work full-time and for her to be prepared to answer such a question." (Id. ¶ 207; see also id. ¶ 206). Plaintiff claims that this question was improper.

Finally, Plaintiff alleges that a 1997 performance appraisal, which rated Plaintiff as "fully successful" rather than her prior year's ranking of "exceeds fully successful," (id. ¶ 212), "ma[d]e reference to her disability, [and] . . . was expressly based on her disability." (Pl. 56.1 Stmt. ¶ 212). Plaintiff informally contacted an EEO counselor in the fall of 1997 and it was

agreed that the evaluation would be changed. (Def/Pl. 56.1 Stmt. ¶¶ 212, 214). However, for reasons that Defendant attributes to administrative error and Plaintiff to discrimination, the change was not made to her file until March 2000. (Id. ¶¶ 214-217). Plaintiff claims that the "incorrect evaluation was in plaintiff's official personnel file and it may have been referenced by reviewing officials in regard to plaintiff's application for transfer or promotion." (Pl. 56.1 Stmt. ¶ 217). Plaintiff also claims that "non-disabled employees received higher ratings on their performance appraisal than disabled employees." (Def/Pl. 56.1 Stmt. ¶ 223). However, other than her 1997 performance appraisal, Plaintiff concedes that "the ratings she received did not affect the terms and conditions of her employment." (Id. ¶ 224).

D.    Sexual Harassment

Plaintiff alleges that she was sexually harassed on October 19, 2000 by outside contractors working at the Brookhaven facility. (Am. Cmplt. ¶¶ 102-03; Def/Pl. 56.1 Stmt. ¶ 225). According to Plaintiff, the contractors "made constant derogatory remarks regarding the female anatomy, which made Plaintiff uncomfortable." (Am. Cmplt. ¶ 103). Plaintiff claims that she reported this harassment to Safrey on October 20, 2000, who advised her to move her seat. (Id. ¶¶ 104, 106). Plaintiff alleges that Safrey's response was "in retaliation for Plaintiff's protected activity of complaining of sexual harassment, and for Plaintiff's prior EEO activity." (Id. ¶ 107). Plaintiff "also reported the incident with the painters and Safrey's allegedly sexist remark to her supervisor." (Def/Pl. 56.1 Stmt. ¶ 239). Plaintiff further alleges that Defendant failed to investigate her complaint, and Safrey "increased his supervision of Plaintiff and began to heavily criticize Plaintiff's work." (Am. Cmplt. ¶ 112). The parties agree that (1) Safrey never made any other allegedly sexually harassing statements to Plaintiff, (Def/Pl. 56.1 Stmt. ¶ 242), (2) Plaintiff was never subjected to any other allegedly sexual harassment at Brookhaven,

10

(id. ¶ 241), (3) "[u]pon learning about the incident, Safrey personally met with the on-site building representative, who assured Safrey that the painters were no longer on the premises," (id. ¶ 245), (4) the painters were removed from the office no later than October 20, 2000, (id. ¶ 243), (5) Safrey "informed the on-site building representative that conduct like that of the painting contractors would not be tolerated in the workplace," (id. ¶ 246), (6) Safrey "reported the plaintiff contractor incident to the Security Office and requested that it ensure that all vendors in the future would be apprised of the IRS' policy prohibiting sexual harassment," (id. ¶ 247), and (7) following the incident, "Fuentes held a meeting with all branch managers to remind them of their duties regarding the prevention of sexual harassment." (Id. ¶ 248).

III.    Analysis

    A.    Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A fact is material if it "might affect the outcome of the suit under the governing law." Holtz v. Rockefeller & Co., 258 F.3d 62, 69 (2d Cir. 2001) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  An issue of fact is genuine only if a jury could reasonably find in favor of the nonmoving party based on that fact. Id.  The moving party bears the initial burden of establishing the absence of any genuine issue of material fact, after which the burden shifts to the nonmoving party to establish the existence of a factual question that must be resolved at trial. Anderson, 477 U.S. at 256-57.  The trial court is required to construe the evidence in the light most favorable to the nonmoving party, and draw all reasonable inferences in its favor. Cifarelli v. Vill. of Babylon, 93 F.3d 47, 51 (2d Cir. 1996).

11

The Second Circuit has recognized that direct evidence of discriminatory intent is rare, and often must be inferred from circumstantial evidence found in the pleadings. Holtz, 258 F.3d at 69. Thus, while summary judgment may be appropriate in such cases, it should be done with an extra measure of caution. Id. (citing McLee v. Chrysler Corp., 109 F.3d 130, 135 (2d Cir. 1997)); see also Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.").

      B.     Disability Claims

          1.     Applicable Standards

Plaintiff alleges that Defendant failed to provide her with a reasonable accommodation as required by the Rehabilitation Act of 1973. Claims under the Rehabilitation Act are subject to the burden-shifting analysis first established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973). See Regional Econ. Cmty. Action Program, Inc. City of Middletown ("RECAP"), 294 F.3d 35, 48-49 (2d Cir. 2002). In order to establish a prima facie case, Plaintiff must show "that (1) she is an individual with a disability within the meaning of the Act, (2) she is otherwise qualified to perform the job in question, (3) she was excluded from her job solely because of her disability, and (4) her employer received federal funding." Borkowski v. Valley Central School Dist., 63 F.3d 131, 135 (2d Cir. 1995); see also Stone v. City of Mt. Vernon, 118 F.3d 92, 96-97 (2d Cir. 1997). An individual is "otherwise qualified for a job if she is able to perform the essential functions of that job, either with or without a reasonable accommodation." Borkowski, 63 F.3d at 135 (citing School Bd. v. Arline, 480 U.S. 273, 287 n.17 (1987)). Upon such a showing, an employer can nevertheless "defeat the claim if it shows (a) that making a reasonable accommodation would cause it hardship, and (b) that the hardship

12

would be undue. The burden of proof on these two issues is on the employer." Stone, 118 F.3d at 97.

### 2. Essential Functions

Defendant asserts that Plaintiff's part-time schedule precluded her from performing the essential functions of the Section Chief position. Essential functions are defined as "the 'fundamental' job duties of the employment position the individual with a disability holds or desires . . . [and] does not include the 'marginal' functions of the position." Mitchell v. Washingtonville Cent. Sch. Dist., 190 F.3d 1, 8 (2d Cir. 1999) (quoting 29 C.F.R. § 1630.2(n)(1)). In determining whether a function is essential, "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8); see also Shannon v. N.Y. City Transit Auth., 332 F.3d 95, 100 (2d Cir. 2003). ("In approaching this inquiry, a court must give considerable deference to an employer's judgment regarding what functions are essential for service in a particular position.") (internal quotations and citations omitted). Other evidence of whether a particular function is essential includes, inter alia, the amount of time spent on the job performing the function and the consequences of not requiring the individual to perform the function. 29 C.F.R. 1630.2(n)(3); Mitchell, 190 F.3d at 8 n. 3.

The duties and responsibilities of the ERRP Section Chief are:

1. Directs, coordinates, or oversees work using supervisors, leaders, team chiefs, group coordinators or comparable personnel.

13

2. Assigns work to subordinates based on priorities, selective consideration of the difficulty and requirements of assignments, and the capabilities of employees.

3. Evaluates subordinate supervisors and serves as the reviewing official on evaluations of nonsupervisory employees rated by subordinate supervisors.

4. Exercises significant responsibilities in dealing with officials of other units or organizations, or in advising management official of higher rank.

5. Interviews candidates for positions in the unit; recommends appointment, promotion, or reassignment to such positions.

6. Hears and resolves group grievances or serious employee complaints.

7. Effects minor disciplinary measures, such as warnings or reprimands, recommending other action in more serious cases.

8. Identifies developmental and training needs of employees, providing or arranging for needed development and training.

9. Assures responsible equity among subordinate organizations of performance standards and rating techniques developed by subordinates.

10. Makes decisions on work problems presented by subordinates.

11. Makes or approves selections for subordinate supervisory positions.

12. Recommends selections for subordinate supervisory positions.

13. Recommends awards or bonuses for nonsupervisory personnel and changes in position classification, subject to approval by higher level officials, supervisors, or others.

14. Finds and implements ways to eliminate or reduce significant bottlenecks and barriers to production, promote team building, or improve business practices.

(Def/Pl. 56.1 Stmt. ¶ 45).

Plaintiff alleges that she is capable of performing the essential functions on a part-time

basis of the Section Chief position because she "was an extremely experienced and diligent

Section Chief and she had even more experienced managers working underneath her." (Pl.

Mem. in Opp. at 7; see also Pl. 56.1 Stmt. ¶ 61; Am. Cmplt. ¶ 64) ("[Plaintiff] worked 150 per

14

cent [sic] within her four (4) hour work day."). Defendant argues that Plaintiff's inability to work full-time necessarily prevents her from being able to perform the essential functions of the position.

As described above, the ERRP Section Chief was responsible for supervising a large team of individuals. (Def/Pl. 56.1 Stmt. ¶ 41). The work performed by ERRP was time-sensitive, (id. ¶ 50), and the Section Chief was required to "closely monitor and control the workflow . . . [and] constantly monitor and reallocate resources to meet the changing needs of the program." (Id. ¶¶ 53-54). Furthermore, the Section Chief was required to respond to and resolve resource management issues quickly and "undertake immediate efforts" to correct problems with the computer system. (Id. ¶ 55).

In Mason v. Avaya Comm., Inc., 357 F.3d 1114 (10th Cir. 2004), the Tenth Circuit held that the plaintiff could not perform the essential functions of her position if she was in the office on a part-time basis. The plaintiff in Mason, a service coordinator at a communications company, was responsible for, inter alia, "schedul[ing] service appointments for technicians working in the field[,] . . . monitor[ing] the current days['] queue of repair tickets and assign[ing] them through the computer system to a technician in the field . . . ." Id. at 1117. The Court, noting its deference for the employer's judgment, found that "physical attendance in the workplace is itself an essential function of most jobs," id. at 1119, and plaintiff's "self-serving testimony" regarding her ability to perform the essential functions of the job insufficient to overcome the evidence to the contrary. Mason, 357 F.3d at 1122.

The ERRP Section Chief position in this case and the service coordinator position in Mason are similar in that both positions (1) require team supervision and constant interaction with co-workers, and (2) place time-sensitive demands on employees. As in Mason, Plaintiff

15

offers only self-serving testimony regarding her capabilities and the requirements of the position in support of her claim. See also Mulloy v. Acushnet Co., 03-11077, 2005 U.S. Dist. LEXIS 12778, at *20 (D. Mass. Jun. 20, 2005) (holding that an electrical engineer responsible for overseeing a manufacturing plant is required to work on-site in order to perform the essential functions of his position because "his duties require[d] him to have access to the machines . . . and those operating them to assess their functioning . . . . The job description also involves training and support of personnel.") (internal citation and quotations omitted).

### 3. Reasonable Accommodation and Undue Hardship

The Rehabilitation Act requires a covered employer to provide reasonable accommodation to disabled employees who are otherwise qualified to perform the essential functions of a job. Borkowski, 63 F.3d at 138-39. The employee bears the burden of demonstrating "the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits." Id. at 138. "The defendant must then show that the accommodation is not reasonable, or that it imposes an undue hardship, which in practice amount to the same thing." Stone, 118 F.3d at 98 (quoting Borkwoski, 63 F.3d at 138) (internal quotations and ellipses omitted). To demonstrate that a proposed accommodation is unreasonable or imposes an undue hardship, the employer must undertake a "common-sense balancing of the costs and benefits" of the proposed accommodation . . . ." Borkowski, 63 F.3d at 140. Accommodations that an employer might consider include, for example, "[j]ob restructuring, part-time or modified work schedules, acquisition or modification of equipment or devices, the provision of readers or interpreters, and other similar actions." 34 C.F.R. § 104.12(b)(2); 45 C.F.R § 84.12(b)(2). Factors to be considered in determining what constitutes an 'undue hardship' include, inter alia, "[t]he type of the recipient's operation, including the composition and structure of the recipient's

workforce; and . . . [t]he nature and cost of the accommodation needed." 34 C.F.R. §

104.12(c)(2)-(3); 45 C.F.R. § 84.12(c)(2)-(3).

Plaintiff's proposed accommodation is a four-hour work day. While the regulations

suggest consideration of, inter alia, "part-time or modified work schedules," 34 C.F.R. §

104.12(b)(2), an "employee's request to be relieved from an essential function of her position is

not, as a matter of law, a reasonable or even plausible accommodation." Mason, 357 F.3d at

1122; Rodal v. Anesthesia Group of Onondaga, P.C., 369 F.3d 113, 120 (2d Cir. 2004) ("[A]

scheduling accommodation is not reasonable if it, in essence, requires an employer to eliminate

an essential function of a job."); Borkowski, 63 F.3d at 140 ("[A]n employer is not required to

accommodate an individual with a disability by eliminating essential functions from the job.").

An eight-hour workday is an essential function of the ERRP Section Chief position. While

Plaintiff claims she is capable of performing the responsibilities of the Section Chief position in

a four-hour workday, this claim is belied by the responsibilities of the position and the fact that

Defendant double-encumbered the position while Plaintiff was temporarily working part-time,

requiring it to "pay[] two employees at full-time salaries to perform the duties of the position . . .

." (Def/Pl. 56.1 Stmt. ¶ 69).[7]

Although Plaintiff claims that Defendant has allowed other individuals to work part-time,

she has offered no evidence that any Section Chiefs or others similarly situated were permitted to

work part-time indefinitely, negating any claim of disparate treatment.

---

[7]Plaintiff suggests that it was unnecessary to double-encumber the Section Chief position, and that Defendant never gave her an opportunity to demonstrate that she could perform the position while working part-time. However, this Court's "role is to prevent unlawful hiring practices, not to act as a super personnel department that second guesses employers' business judgments." Byrnie v. Town of Cromwell Bd. of Educ., 243 F.3d 93, 103 (2d Cir. 2001) (internal citations omitted). Plaintiff's claim regarding Defendant's decision to double-encumber her position refutes Defendant's business judgment, to which this Court defers.

Moreover, Plaintiff's claim is supported only by her self-serving testimony regarding her alleged efficiency and diligence. (Am. Cmplt. ¶ 64) ("[Plaintiff] worked 150 per cent [sic] within her four (4) hour work day."). Based upon the failure of proof and the deference owed to the employer's business judgment as to the essential functions of the Section Chief position, Rodal, 369 F.3d at 120, Plaintiff has failed to meet her burden. Furthermore, Defendant has demonstrated that Plaintiff's proposed accommodation is unreasonable and would impose an undue hardship on Defendant.

4.    Retaliation

Plaintiff alleges that her placement in a GS-9 position was in retaliation for her request for accommodation and her "formal and informal complaints of discrimination to defendant's Equal Employment Opportunity." (Am. Cmplt. ¶¶ 17, 13). As an initial matter, "[a] plaintiff may prevail on a claim for retaliation even when the underlying conduct complained of was not in fact unlawful so long as he can establish that he possessed a good faith, reasonable belief that the underlying challenged actions of the employer violated the law." Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002) (internal citations, quotations and brackets omitted). Thus, the fact that Plaintiff's claims regarding Defendant's underlying conduct lack merit does not necessarily render Plaintiff's retaliation claim meritless as well.

"Claims for retaliation are analyzed under the same burden-shifting framework established for Title VII cases." Id.[8] In order to establish a *prima facie* case of retaliation, Plaintiff, "must show that: (1) [s]he engaged in an activity protected by the [Rehabilitation Act];

---

[8]Plaintiff asserts retaliation claims under both the Rehabilitation Act and Title VII for the same allegedly improper conduct. (Am. Cmplt. ¶¶ 129-140). It is clear that disability discrimination is not actionable under Title VII, Harrison v. N.Y. City Hous. Auth., 01 Civ. 3664, 2001 U.S. Dist. LEXIS 21551, *4 (S.D.N.Y., Dec. 26, 2001), and any such claim is therefore dismissed. In any event, the same analysis applies under both Title VII and the Rehabilitation Act.

(2) the employer was aware of this activity; (3) the employer took adverse employment action against [her]; and (4) a causal connection exists between the alleged adverse action and the protected activity." Id. If a plaintiff is able to establish a *prima facie* case, "the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the challenged employment decision. If a defendant meets this burden, the plaintiff must point to evidence that would permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation." Id. at 721 (internal citation and quotations omitted).

Defendant contends that it transferred Plaintiff to the GS-9 position because it could not afford to double-encumber the ERRP Section Chief indefinitely.[9] Plaintiff argues that this explanation is pretextual because previous Section Chiefs "have been permitted to perform the essential functions of their job in less than eight (8) hours per day . . . [and m]oreover, plaintiff is very experienced and was willing to work different hours, if necessary, in order to complete her job duties." (Pl. Mem. in Opp. at 15). However, Plaintiff has failed to identify any Section Chief who was permitted to work part-time on an indefinite or year-round basis and, Plaintiff's claim that she was willing to "work different hours . . . to complete her job duties" does not obviate the necessity of doubly-encumbering the position. Plaintiff has therefore failed to demonstrate that Defendant's legitimate, non-discriminatory reason for her transfer was pretextual.[10]

---

[9] Defendant assumes, without conceding, that Plaintiff has established a *prima facie* case. Because Plaintiff is unable to demonstrate Defendant's legitimate, non-discriminatory reason is pretextual, it will be assumed, without deciding, that Plaintiff has established a *prima facie* case.

[10] In fact, Defendant appears to have repeatedly tried to accommodate Plaintiff both before and after her complaints, specifically creating the GS-9 position for Plaintiff, (Def/Pl. 56.1 Stmt. ¶ 112), offering her the opportunity to work part-time in a higher level management position, (id. ¶¶ 147-48), and providing her with an opportunity to reconsider her rejection of the lower-grade positions. (Joint Pretrial Order ¶ 25).

Plaintiff also asserts that she was not selected for several positions at a higher grade because of her disability and in retaliation for her complaints. (Am. Cmplt. ¶¶ 83-84). According to Plaintiff, she applied for approximately "fifteen (15) available positions in which she was capable of the corresponding essential functions . . . [but] defendant denied her each position despite her being, upon information and belief more qualified than each individual selected for each position." (Id.). However, Defendant has shown that Plaintiff did not formally apply for several of the disputed jobs, (Def/Pl. Stmt. ¶¶ 149-154), that one of the positions for which Plaintiff did apply was never funded and consequently not filled by anyone, (id. ¶¶ 156-158), and that Plaintiff was not selected for other positions because she was not the best qualified individual for the positions. (Def. 56.1 Stmt. ¶¶ 136-146). While Plaintiff disputes the claim that she was less qualified than the individuals eventually selected, she has failed to offer any evidence in support of this contention other than her own self-serving evaluation of her qualifications.[11]

Plaintiff also claims that her October 1997 evaluation rating was lowered as a result of her disability. (Am. Cmplt. ¶¶ 29, 30). However, Defendant corrected the evaluation after Plaintiff lodged a complaint with the EEO, (Def/Pl. 56.1. Stmt. ¶¶ 214, 219), and has offered the legitimate, non-discriminatory reason (administrative error) for the delay in effecting the change. Plaintiff has failed to establish that this explanation is pretextual. Shannon, 332 F.3d at 99 ("Conclusory allegations, conjecture, and speculation are insufficient to create a genuine issue of fact.") (internal citations, quotations and ellipses omitted). Plaintiff's claim that the reference to her disability in her evaluation precluded her from obtaining GS-11 or higher positions is

---

[11]Indeed, Defendant's contention that Plaintiff lacked the necessary qualifications is further supported by Shelley Goldenberg's proposal that Plaintiff work part-time in her department "in order to gain more experience." (Def/Pl. 56.1 Stmt. ¶ 147).

without merit. Defendant has offered legitimate, non-discriminatory explanations for Plaintiff's failure to be chosen for the positions which she sought and Plaintiff has failed to demonstrate that such explanations are pretextual. Plaintiff also concedes that she did not file any formal complaint of discrimination relating to this evaluation. (Def/Pl. 56.1 Stmt. ¶ 213). Finally, Plaintiff has also failed to establish any causal connection between any of her alleged protected activity and the adverse employment actions.

5.    Hostile Work Environment

A plaintiff asserting a hostile work environment claim must demonstrate that (1) "the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," Feingold v. New York, 366 F.3d 138, 149 (2d Cir. 2004) (internal quotations and citations omitted), and (2) there exists "a specific basis for imputing the conduct creating the hostile work environment to the employer." Id.[12]    In order to survive summary judgment, Plaintiff must satisfy both the objective and subjective elements, namely "the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive." Id. at 150 (internal quotations and citations omitted). Defendant has moved for summary judgment on the ground that Plaintiff has failed to identify sufficiently severe or pervasive harassment. (Def. Mem. at 28-31). Although Plaintiff has failed to oppose Defendant's motion for summary judgment on this claim, (see Pl. Mem. in Opp. at 16-

---

[12]Although the Second Circuit has yet to explicitly recognize a hostile work environment claim based on disability, see Bonura v. Sears Roebuck & Co., 02-7991, 62 Fed. Appx. 399, 400 n. 3, 2003 U.S. App. LEXIS 8440 (2d Cir. 2003) ("The Second Circuit has yet to determine whether the ADA gives rise to a cause of action for hostile work environments . . . ."), at least two other Circuit Courts, Fox v. General Motors Corp., 247 F.3d 169, 176 (4th Cir. 2001); Flowers v. Southern Reg'l Physician Servs., Inc, 247 F.3d 229, 232-35 (5th Cir. 2001) and several District Courts in this Circuit, including this Court, Johnson v. City of New York, 326 F. Supp. 2d 364, 371 (E.D.N.Y. 2004) (Feuerstein, J.), have recognize the viability of such claims.

17) (opposing summary judgment on alleged sexually hostile work environment only), this Court retains an obligation to "assess whether the moving party has fulfilled its burden of demonstrating that there is no genuine issue of material fact and its entitlement to judgment as a matter of law." Vt. Teddy Bear Co. v. 1-800 BEARGRAM Co., 373 F.3d 241, 244 (2d Cir. 2004) ("[W]here the non-moving party chooses the perilous path of failing to submit a response to a summary judgment motion, the district court may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial.") (internal quotations omitted).

Plaintiff's Amended Complaint appears to claim she was subjected to a hostile work environment based upon her disability because (1) upon her return as a part-time employee, she was not assigned to her former office space, (Am. Cmplt. ¶ 35), (2) she was subjected to increased supervision and "treated differently than similarly situated employees," (id. ¶ 38), (3) she was allegedly excluded from meetings, (id. ¶ 39), and (4) advised to be prepared for questions regarding her part-time status. (Id. ¶ 47).

These allegations are insufficient to establish the severe and pervasive conduct required to establish a hostile work environment claim. Defendant has provided evidence that (1) Plaintiff was not assigned her former office because, while working part-time, she was no longer performing the functions of a Section Chief, (Def/Pl. 56.1 Stmt. ¶¶ 194-196), (2) Plaintiff was subjected to increased supervision because she was no longer working in a supervisory position, and her "non-supervisory projects . . . required supervision . . . .," (Def. Mem. at 29; Df/Pl. 56.1 Stmt. ¶¶ 199-200), (3) the single meeting identified by Plaintiff from which she was excluded was held during the portion of the workday during which Plaintiff was not at work, (Def. Mem. at 29; Def/Pl. 56.1 Stmt. ¶¶ 201-04) and, in any event, her absence was not noted in any of her

22

evaluations or reviews, (Def/Pl. 56.1 Stmt. ¶ 205), and (4) Safrey's comment during a mock interview was simply his observation that the positions for which Plaintiff was applying were full-time and that she might expect questions regarding her ability to work full-time. (Id. ¶ 207).[13] Furthermore, it is undisputed that Safrey had "no role and no involvement in the selection of a candidate" for the position at issue. (Id. ¶ 208). Thus, Plaintiff has failed to demonstrate that she was subjected to sufficiently pervasive or severe conduct, and her hostile work environment claim is dismissed.

Insofar as Plaintiff appears to assert claims sounding in retaliation based on these allegations, Plaintiff has offered no evidence indicating that Defendant's proffered legitimate, non-discriminatory explanations are pretextual.

C.      Sex-Based Discrimination

Plaintiff contends that the allegedly harassing behavior by the outside contractors, as well as Safrey's response to her complaints about this alleged harassment, created a hostile work environment based upon gender discrimination. A plaintiff asserting a hostile work environment claim must establish (1) "the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," Feingold, 366 F.3d at 149 (internal quotations and citations omitted), and (2) there exists "a specific basis for imputing the conduct creating the hostile work environment to the employer." Id. Title VII requires a plaintiff to "prove that discriminatory harassment occurred with respect to 'terms, conditions, or privileges' of employment.'" Kotcher v. Rosa & Sullivan Appliance Ctr., 957 F.2d 59, 62 (2d Cir. 1992) (quoting, in part, 42 U.S.C. § 2000e-2(a)(1)). "A court should

---

[13]Although Plaintiff also alleges that her 'CA-1' injury claim was not timely filed in November 1999, (Am. Cmplt. ¶ 54), this claim, either on its own or in aggregation with the other allegedly improper conduct, is insufficient to establish the type of pervasive and severe actions that are necessary to support a hostile work environment claim.

consider the offensiveness of the defendant's conduct, its pervasiveness, and its continuous nature . . . . The incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief." Kotcher, 957 F.2d at 62.

Plaintiff has failed to establish that the October 19, 2000 incident and Safrey's alleged response altered the "compensation, terms, conditions, or privileges" of her employment. 42 U.S.C. § 2000e-2(a)(1). Plaintiff has conceded that neither Safrey nor any other employee ever engaged in any sexually harassing behavior on any other occasion. (Def/Pl. 56.1 Stmt. ¶¶ 241-42). It is well-established that "isolated incidents of offensive conduct (unless extremely serious) will not support a claim of discriminatory harassment." Petrosino v. Bell Atl., 385 F.3d 210, 223 (2d Cir. 2004); see also Holtz, 258 F.3d at 75. Because the comment was an isolated instance and at most "merely offensive," Harris v. Forklift Sys., 510 U.S. 17, 21 (1993), it does not support a hostile work environment claim. Plaintiff's claim is therefore dismissed.

D.   Intentional Infliction of Emotional Distress

"[F]ederal employees are restricted to Title VII when complaining of employment discrimination." Annis v. County of Westchester, 36 F.3d 251, 255 n. 4 (2d Cir. 1994) (citing Brown v. General Services Admin., 425 U.S. 820, 835 (1976)). Plaintiff, who did not oppose Defendant's motion for summary judgment on this claim, is precluded as a federal employee from asserting employment discrimination claims under state law. See Rivera v. Heyman, 157 F.3d 101, 105 (2d Cir. 1998) (applying Brown to Rehabilitation Act claims). Plaintiff's state law claim therefore is dismissed.

## IV. Conclusion

For the reasons stated above, Defendant's motion for summary judgment is GRANTED.

The Clerk of the Court is directed to close this case.


IT IS SO ORDERED.


Sandra J. Feuerstein
United States District Judge

Dated: June 14, 2006
Central Islip, New York

To:

Scott M. Mishkin
Scott Michael Mishkin, P.C.
One Suffolk Square
Suite 520
Islandia, NY 11749

Catherine Mary Mirabile
United States Attorneys Office
147 Pierrepont Street
Brooklyn, NY 11201